[L. A. No. 9206. Department One.—February 25, 1928.]

P. A. BEHANNESEY, etc., Respondent, v. STUART PATON et al., Copartners, etc., Defendants; CINEMA FINANCE CORPORATION (a Corporation), Appellant.

Farrand & Slosson for Appellant.

David E. Fulwider and Harold A. Fendler for Respondent.

SEAWELL, J.—This appeal is taken from a judgment entered against appellant on account of its obligations arising from the production of a motion picture. Judgment by default went against H. C. Maynard and Stuart Paton Pictures Company of Los Angeles. The appeal is prosecuted alone by Cinema Finance Corporation.

Stuart Paton Pictures Company of Los Angeles was an association of individuals consisting of Stuart Paton, H. C. Maynard, and W. G. Taylor. Cinema Finance Corporation was incorporated under the laws of the state of Delaware, engaged, apparently, in the business of distributing motion pictures to the trade. Prior to the execution of any of the contracts herein mentioned, Stuart Paton Pictures Company had entered into a contract with the Associated Exhibitors, Inc., the terms of which are not important, by which said Stuart Paton Company agreed to manufacture and deliver said motion picture for distribution. This contract, how-

ever, was reckoned with by the Stuart Paton Pictures Company and Cinema Finance Corporation in the contract entered into by them on May 14, 1925, which contract is of paramount importance in determining the rights of the parties to this appeal. All of the parties herein were engaged one way or another in the motion picture industry. Cinema Finance Corporation seems not to have been limited merely to furnishing financial assistance to producers of pictures and promoters of enterprises, but, according to a term selected by itself and inserted in its contract, it lent its "co-operation" as well as its financial assistance to the producers and manufacturers of motion pictures to whom it furnished money to accomplish or complete picture enterprises. The contract made by it indicates very clearly that it was more than a mere financial concern and that it entered into joint enterprises or ventures with producers, reserving unto itself almost absolute power in directing, supervising, and controlling the production and manufacture of pictures which it undertook to finance.

The estimate cost of producing the picture which forms the basis of this controversy was $60,000. Of this sum the Cinema Finance Corporation was "willing to advance $26,500" and the Stuart Paton Pictures Company was "willing to furnish the sum of $33,500," said sums to be advanced by both parties during the course of production as the ratio of each party's total advance bore to the total cost of production. As security for the repayment of all sums advanced by said Cinema Finance Corporation, together with interest thereon, it was agreed that said Stuart Paton Pictures Company assigned, transferred, mortgaged, and pledged unto said Cinema Finance Corporation all right, title and interest in and to all negatives and positive prints of every kind that might be made of said motion pictures, together with the right of possession. Every possible right or privilege that may have accrued to Stuart Paton Pictures Company by reason of its part in the production of said picture or its interest therein was covered by said assignment and mortgage. It was also provided in said contract that all contracts made or which might be made thereafter by said Stuart Paton Pictures Company "with actors, actresses and members of their staff in the production of

said picture, shall be in form assignable to second party [Cinema Finance Corporation] and provide that the said persons in said contracts mentioned or referred to shall be obliged, when requested to do so by said second party, in case first party (Stuart Paton Pictures Company) shall fail, refuse, neglect or be unable to personally carry on the production of said pictures, to perform the services thereunder in the making of said pictures for said Cinema Finance Corporation and under the direction of such directors as second party shall designate. First party shall, upon execution hereof, deliver to second party copies of such contracts as first party may have entered into with any persons for services to be performed in the course of said production, it being understood that as to such contracts second party shall be subrogated to the rights of first party.'' The contract contains a provision that in the event that the director Stuart Paton, placed in charge by Stuart Paton Pictures Company, shall become incapacitated for a period of more than five successive days, or in the event of his neglect or refusal to personally supervise and direct said production said Cinema Finance Company may, under certain contingencies, assume the direction, supervision, control, and completion of the said picture and for such purposes employ such director or directors as may be acceptable to said Associated Exhibitors, Inc., and may employ such persons and means as to it [Cinema Finance Company] may seem best and in the event it shall undertake the completion of said picture it shall have access to and full use of the studio where the same is being produced and full use of the services of all actors, actresses, directing staff, and employees of said Stuart Paton Pictures Company and all costumes, sets, scenes, properties, paraphernalia, apparatus, and equipment, and immediate and continuous access and use of all contracts, records, books, stories, scenarios, etc., and other materials belonging to or under the control of or available to said Stuart Paton Pictures Company for use in said production. It is expressly provided that said Cinema Finance Corporation ''shall not be obligated to advance for any and all purposes a sum in excess of $26,500 in the production of said picture,'' but it may do so if it sees fit.

Said contract is very full in detail and gives to the Cinema Finance Corporation, for its protection, absolute power to take over the entire venture, substituting itself in the place of Stuart Paton Pictures Company, at its option, upon the happening of the contingencies named therein and complete the production of the picture. This contract was made and recorded some time before the contract upon which the judgment herein rests was made by Stuart Paton Pictures Company with respondent, P. A. Behannesey, doing business under the firm name and style of Behannesey Art Studio, by the terms of which said Behannesey was to furnish certain dressings for sets and properties to be used in the production of said picture at the agreed price of $1,500. Appellant admits and urges as an argument in support of its appeal the fact that Behannesey had knowledge of the contract existing between the Stuart Paton Pictures Company and the Cinema Finance Corporation at the time he entered into his contract with the Paton Pictures Company, and for that reason was bound by all the terms of the appellant's contract. There can be no doubt that Behannesey had full knowledge of said Cinema Finance Corporation's contract, as asserted by appellant, nor is there any doubt that appellant had full knowledge of the Behannesey contract long prior to the day it took over the completion of the picture. Behannesey's knowledge of the powers expressly reserved by Cinema Finance Corporation to take over all contracts made by Stuart Paton Pictures Company with third parties and its right to be *subrogated* in the place of said Picture Company in outstanding contracts if it should elect to complete the picture, which it actually did, is a fact in support of respondent's case rather than against it. Behannesey's knowledge of the Cinema Finance Corporation's contractual rights no doubt had some influence upon his action. The fact that a financial concern was interested in the project to the extent that it reserved to itself the right to complete the picture in the event the original promoters failed therein was a circumstance calculated to inspire in the minds of those who engaged to furnish skill, labor, or materials in and for the production of the picture an assurance that the financial sponsor in the event it should elect to complete the picture would com-

pensate those whose skill, labor, and materials contributed to its production.

Respondent's contract was made with Stuart Paton Pictures Company on May 30, 1925. Appellant, on June 9th, paid the full amount it unconditionally obligated itself to pay by its contract, to wit, $26,500, but the picture was not completed. It thereupon, on said June 9th, assumed full charge of the production and completion of said motion picture, discharged the production manager placed in charge by Stuart Paton Pictures Company and placed in his stead a Mr. Travers, a manager of its own selection. Other officers of appellant became active in the production of said picture. On June 16th Stuart Paton, Maynard, and Taylor executed a bill of sale conveying all of their right, title, and interest in and to said moving picture production to appellant. Respondent's property, including sets and props, remained in the studio. The greater portion of it had been used in the production of the picture under the Stuart Paton Pictures Company *régime*. Some of it, however, was reused by appellant and other property not before brought into the picture was furnished by respondent to appellant.

We think there is no ground upon which the appeal can be sustained by virtue of the provisions of subdivision 2 of section 1624 of the Civil Code, or on the theory that Douglas Travers exceeded his authority in acknowledging the past indebtedness due under respondent's contract.

The positive testimony of John Hauerwaas, assistant secretary and assistant manager of appellant, Cinema Finance Corporation, and Douglas Travers, specially appointed by appellant production manager for the completion of said motion picture, is that said production manager was authorized by Maurice Barber, manager of appellant, to do all things necessary to keep the picture in production, which included the hiring and assembling of sets and props and the doing of everything necessary to complete the production of said picture. Upon assuming his duties Travers told respondent and other creditors that he had been placed in charge of the production of the picture by the Cinema Finance Corporation and was engaged in checking up the indebtedness of the Stuart Paton Pictures Company. The only possible inference that may be reasonably drawn from

the testimony of Travers, Gatzert, L'Estrange, Agard, Essey, and Hartley is that Travers gave respondent's representative and various other creditors to understand that the indebtedness incurred by the Stuart Paton Picture Company was assumed by the appellant and that it had subrogated itself in place of Stuart Paton Pictures Company, as in its contract with said company it had expressly reserved the right to do, and that a continuance of the performance of the contracts made by said creditors with Stuart Paton Pictures was the condition upon which and thereby furnished a consideration—if indeed appellant was not obligated for other reasons—for the assumption by appellant of all obligations arising from partially performed contracts in the production of said picture. That the statements made by Mr. Travers immediately upon assuming the position of manager of production of the picture, to wit, on June 11th, as to the money due respondent upon his incompleted contract to the effect ''you needn't worry about your money, it will be paid,'' would, if there were no other question involved, be deemed a promise under subdivision 3, section 2794, of the Civil Code, to answer for the obligation of another made upon a consideration beneficial to the appellant, there seems no room for doubt. Respondent had furnished under its original contract dressings and props for a number of settings and agreed to furnish a draper to hang all drapes, and did, after appellant had taken over the completion of the picture, furnish to appellant properties in accordance with its original contract with Stuart Paton Pictures Company, and supplied the services of a draper, set dresser, and assistant set dresser. The property and services furnished by respondent formed a substantial part of the picture when completed and some of the property which was furnished under the original contract was ''shot'' over again by appellant and the scene as thus revised was used in the production of the picture.

Appellant has cited a number of appellate court decisions of this state, as well as certain sections of the Civil Code, to the effect that a special promise to answer for the debt or default of another is invalid unless in writing and subscribed by the party to be charged or his agent, except in the cases provided for in section 2794 of the Civil Code. We

have been cited to no case where the court applied appellant's contentions to facts similar to the facts of the instant case. ▪ The respondent in this case was induced to complete his indivisible contract upon the promise of appellant that he would be treated as an original contractor, based upon a consideration that was beneficial to the promisor. It is not probable that respondent would have otherwise agreed to complete the contract, but for the promise on the part of appellant that it would place itself in the place of the original promisor. All of the inferences support respondent's claim.

Judgment affirmed.

Preston, J., and Curtis, J., concurred.